Again, may it please the court, I'm Robert Jobe and I'm appearing today on behalf of the petitioner, Mr. Nick Haque. After being convicted of a deportable criminal offense in April of 1995, Mr. Haque entered into a quid pro quo agreement with the U.S. government under which he agreed to provide DEA with evidence against his co-defendants, testify before a grand jury, which he did in October of 1995, some six months before the enactment of AEDPA, and withdraw his appeal of the conviction that he had sustained, as well as all other post-trial motions. Based on, quote, the substantial assistance in drug investigations afforded by Mr. Haque, unquote, the U.S. government agreed to file a motion to reduce Mr. Haque's sentence, a motion that was granted by a sentencing judge on May 20, 1996. Now, relying on this court's decision in Armendariz Montoya, and consistent with the two decisions of the Board of Immigration Appeals in this case, the government argues that because Mr. Haque did not plead guilty to the criminal charges that form the basis of the charge of removability here, but instead took his case to trial, Mr. Haque is precluded from establishing any sort of reliance interest that can form the basis of a Landgraf-type retroactive. As long as you're not in the Third Circuit. Right. Exactly. You know, I think Atkinson has it exactly right. Obviously, that's not the law of our circuit. But anyway, the government argues that he's precluded from establishing any sort of reliance interest that can form the basis of a retroactivity claim, and suggests that Mr. Haque's post-conviction conduct is completely irrelevant to any analysis of whether AEDPA and IRA-IRA's restrictions can be applied to him. Now, as far as I can tell, that particular position, the government's position, has not been accepted in any circuit. In assessing whether AEDPA and IRA-IRA's restrictions on 212C relief can be applied to Mr. Haque, we have to determine whether AEDPA or IRA-IRA impose some new burden on conduct that was completed before the enactment of those two statutes. So as a threshold question, I guess we have to decide what is the completed conduct that's at issue here. Now, in Armendariz-Montoya and Saravia-Paguada, as well as in the Second Circuit's decision in Rankin, the Fifth Circuit's decision in Hernandez-Castillo, the conduct at issue, the conduct that was being focused on there was limited to two things. The actual commission of the crimes at issue, and secondly, the decision to contest the criminal charges and go to trial rather than enter a guilty plea. And focusing exclusively on those two forms of completed conduct, this Court and others have held that aliens who committed crimes and then fought those criminal charges can't plausibly claim that they would have acted any differently if they had known about AEDPA's restrictions on 212C relief. This Court, as well as the Second, Fifth, and Tenth Circuits have all recognized, however, that the fact that an alien was convicted at trial is not the be-all, end-all of retroactivity analysis, and that even permanent residents convicted at trial can retain their eligibility for discretionary relief from removal if they can establish that AEDPA or IRA-IRA would impose some impermissible retroactive effect on their post-conviction conduct. Mr. Shrove, I know you've argued a broader set of reliance, including going to trial and so forth. It seems to me that your best argument, and I'm only speaking for myself, that your strongest argument is that he gave up his appeal rights. Now, how do we deal with that in light of the statement in St. Cyr, the comment on persons going to trial giving up their constitutional rights? Right. Well, I think there's obviously nothing in St. Cyr that requires generally a quid pro quo, but even if a quid pro quo is required, and everybody agrees that no quid pro quo is required. That's not required by Hughes Aircraft, Martin v. Haddox, any of those other Supreme Court cases. They don't require a quid pro quo at all. And what the Supreme Court said in that case. So what is required? Some kind of reliance interest? Well, here in this circuit, we require objectively reasonable reliance. And in this particular, what Kamen's, this Court's decision in Kamen says is although you don't need a quid pro quo, if you can establish a quid pro quo, that's clearly sufficient. It says it's clearly sufficient. And here we have a quid pro quo. It's just not, he's just not giving up a constitutional right. He's giving up a statutory right. In fact, he gave up a number of things. Not only did he give up his direct appeal, he agreed not to pursue or to withdraw his motion for acquittal and his motion for a new trial. But also I think there's another issue here in terms of his reliance interest. Relying on the availability of 212C relief, he agreed. I'm sorry. Let me just go back. Yes, Your Honor. The motion for a new trial and motion for acquittal had not been ruled on by the district court? No. No. They had not been ruled on. And they were withdrawn? Well, the record is unclear whether they were not, whether they were withdrawn. That's why I asked, because I didn't find this in the record. Yeah. It's set forth in Jerry Frolick's declaration, Mr. Haack's criminal attorney at the time. He makes clear that he thought that Mr. Haack had what he describes as an excellent chance of prevailing on his motion for acquittal. And yet as part of the agreement that they struck with the U.S. Attorney's Office, they agreed not to pursue that. So it's the combination of withdrawing his appeal. And a little suspect, a lawyer's statement of excellent chance of prevailing. Of course. Yeah. And, you know, we take that for what it may. But, you know, we have to assume at the same time that's sort of what he was advising his client at the time. The principal grounds for appeal were that there was no evidence, there was no secure evidence that this was actually math. Right. Yes. And, you know, Mr. Haack. I'm sorry. It was actually ecstasy. It was ecstasy. Excuse me. Yeah. And Mr. Haack, in his declaration on page 182 of the record, he indicates that he was quite, after talking with various attorneys, he was quite optimistic about his chances on appeal. Yet he decided pursuant to this agreement to withdraw that appeal. And so our position is it's not enough to focus on the mere fact that he went to trial. We have to look at what conduct post-trial did he engage in. From Mr. Haack's perspective, having already drawn a sentence of 41 months, he was already thought that he was eligible for 212C relief. That's right. The only way that he can beat ERIRA and the AEDPA amendments is if he can get to zero, is if he can win on appeal. Exactly. That's right. That's the only way that he can win. So he's already under the five-year cap. So he still thinks he's got 212C relief. At his first trial, was there a possibility that his sentence would exceed five years? Yeah. We're trying to figure that out. I believe that there was. I believe that there was. I'm having a difficult time ascertaining what was the maximum possible sentence for the crime. And I don't have an answer for you on that, unfortunately. But I believe it was, yeah. You have two cases under appeal. What is the precise relief you ask under each of those cause numbers? Well, you know, the issues presented by the two cases, they seem to me to be the identical, you know. The evidence is slightly different. But ultimately, the question is, was the board correct in saying that Mr. Hock was ineligible for 220? I'm not willing to put them all in one pot. You've got two causes of appeal. Right. Tell me what you want under 15. The relief is that we want this Court to ultimately find that Mr. Hock has set forth a valid retroactivity claim. Are you waiving the first one, then? No. You don't want a remand? Well, I think with respect to the first one, the Board of Immigration Appeals said that they can't even rule on this issue. And strangely, this Court's precedent seems to agree with this. This Court's precedent says that we don't have to even raise these retroactivity claims with the Board because the Board can't rule on them. This Court said that in Saravia-Paguada. It said it in Garcia-Ramirez. So it's not an issue, supposedly, that the Board has jurisdiction to entertain. Are you waiving the first appeal? No, not at all. We think the Board was incorrect in suggesting that Mr. Hock had failed to establish a valid retroactivity claim, because if you look at page 182 of the record, there he makes clear that he did withdraw his appeal in reliance on the availability of 212C relief. And we think that that alone is sufficient to say. But you don't really want the BIA to rule on retroactivity, do you? No. Does this panel have the authority to order the BIA to consider the retroactivity? Yes. Okay. I thought I'd understood you to tell Judge Beezer that our cases seem to suggest that they support the Board in its view that it cannot consider retroactivity. That's right. And what I said to Judge Beezer is right as well. I guess the problem here with what happened at the Board is the Board never resolved the factual dispute about when the agreement took place. The government's taking the position that there's no evidence here that the agreement was entered into before the important date, April 24, 1996. And the Court of Appeals, obviously, is not a fact-finding body. On that particular point, the case may have to go back so that the Board can make a determination as to when the deal was struck. I mean, we think the deal was obviously struck in June of 1995 because he began relying on the deal and, in fact, testified before the grand jury in October 1995. But that aspect of the case may have to go back to the Board so the Board can resolve that. But the legal question about whether, you know, somebody who withdraws an appeal or cooperates with DEA in hoping to improve his chances of success on appeal, those are issues that this Court has to decide because the Board itself is claiming that it has no jurisdiction to decide them. If there are no further questions, I'll reserve the balance of my time. Okay. Ms. Farrier. Good morning. May it please the Court. My name is Cindy Farrier, and I'll be representing the Attorney General in this matter. Judge Veazer, as you pointed out, it is critical to note that there are two cases before the Court and what exactly is before the Court with regard to each of them. The first is the dismissal of the appeal in which the Board relied on St. Cyr to find that the Petitioner was not eligible for relief. In that particular case, the Petitioner did not raise his actual reliance or his specific reliance on going to trial. Secondly, there is the denial of Petitioner's motion to reopen in which the Board relied upon its regulation to find that he wasn't eligible to go to trial. Is the dismissal for failure to state a claim or is the dismissal because it was not timely filed? I'm sorry. Because it was not. I didn't hear you. Pardon? I didn't hear you. I'm asking. I was dismissed. Why do you urge? The first appeal was dismissed because he had gone to trial and the Board determined that under St. Cyr that was not inappropriate. He was ineligible then for relief for 212C. There's no dispute that the Board's decision in applying its own regulation was appropriate, that is, that the regulation, you know, properly promulgated does bar an alien who's gone to trial from getting relief. So, therefore, the denial of the motion to reopen really was the correct decision. And what's before the Court then should be, if anything, the dismissal of appeal and looking at the issues raised with regard to that. So, counsel, if we were to rule that Mr. Haig had a reasonable reliance interest and that it was sufficient under St. Cyr, then what should the panel do? If you were to find that there was a reasonable reliance under St. Cyr, then it would still need to go back to the Board in order for the Board to, obviously, evaluate the merits of the petitioner's claim and to determine whether or not it was appropriate. And so which docket number do we deal with? Oh, it would be the first, or I guess it would be the second docket number. It would be the one that came through habeas, which was the actual seeking review of the dismissal of appeal. That's the one, then, that we would remand to the Board? Correct. And that one, again, the claims regarding him going to trial in reliance on 212C were not properly raised and were not before the Board at that point. That's our argument regarding exhaustion in the case, that that's why the Court shouldn't find that the going to trial aspect of his claim, the reliance aspect, should be considered by the Court. It should not be considered by the Court because it wasn't properly exhausted and that's the only real case which raises it. However, the government's position is clearly that his claims on both aspects of his reliance, either it being going to trial or on seeking post-trial either motions or his appeal, are foreclosed by this Court's case law. The Court is well aware of Armendariz, which says that an alien who goes to trial cannot possibly or plausibly claim that they would have acted differently had they known about the elimination of 212C relief. And Saravia reaffirms this principle and states even more strongly, in concluding in Armendariz that such a claimed reliance interest is per se unreasonable, we reaffirmed a narrow reading of St. Cyr and excluded categorically claims for 212C relief outside of the guilty plea context. That language there precludes all of his claims. And the Court's consideration of the case can stop there. If the Court, though, wants to go further and consider later case law that seems to suggest that there might be an objectively reasonable reliance that it can examine, then that is where our argument regarding the liberty interest or the vested right is not sufficiently substantial here to bring about this retroactivity analysis. And in making that point, we had several points. Sotomayor, let me just, playing the devil's advocate or the Third Circuit's position would be that there is not. This Court's case law, I think, precludes. I'm not talking about the Ninth Circuit. I'm talking about the Supreme Court. The Supreme Court. Landgraf and the other retroactivity cases. Reliance is not a factor at all in determining retroactivity, is it?     I'm not aware of that. I'm not aware of that. I'm not aware of that. I'm not aware of, in the Supreme Court's jurisprudence, relying on or bringing up reliance, I guess, or relying on that factor. But St. Cyr, which is very closely akin to this particular case, does make reliance a pretty critical factor, and this Court has reaffirmed that principle in its case law. And in addition, if you weren't to consider reliance a factor here, I think that the Court would be basically rendering moot the whole analysis that the Supreme Court did in St. Cyr. Maybe it was the only way you could get enough justices to sign up on one side. Maybe. But that is, in fact, what they came up with. So, again, the interest at stake, we argue, is not substantial enough to bring about the analysis of the retroactivity of this case. Why isn't it? Because withdrawal of the appeal is not akin to a guilty plea. Again, as you've already mentioned, it's not a constitutional right to appeal a criminal conviction. It's only statutory. That's not akin to the guilty plea. But if this is his only chance to satisfy, if he's given up the one shot he's got to get discretionary relief from the government, then why isn't that sufficient? He cooperates with the government. He thinks he's got a sentence that's below that he's still qualified for. And now he's going to give up his only shot at being able to stay in the country, which may be a long shot. We don't know. His attorney was confident, but defense attorneys are always confident in that situation. Well, I think then we need to look at the Court's case or decision in Kalaava, if Armandari's, and emphasize the Supreme Court's concern in St. Cyr that the alien had detrimentally relied on the availability of 212C and making, in that case, the plea agreement. In this case it would I don't see that any of these cases and I realize we have some very, very broad language and that we spoke in sort of categorical terms. But I don't see that any of these cases ever had the opportunity to consider what happens if somebody gives up an appeal, right? I don't think that they have considered that, but it's unclear. As I pointed out in the 28J letter, there are, I believe, five cases, maybe six since 2007, which Armandari's has been applied. It's not clear what arguments were actually being raised there, but it does appear as though it was a categorical denial for persons who have gone to trial. With regard to a person who gives up the right to appeal, again, you know, as we were, as I was pointing out, it's not akin to the guilty plea in the sense that it's not as substantial of an interest. And we point out the various reasons in our brief, I believe. And in addition, even if you were to look at that belief in this particular case, the objectively reasonable belief that he cites is that he believes that he would still be eligible if he withdrew that appeal. But again, it doesn't make clear what was his detrimental reliance in withdrawing that appeal. Basically, the government gets no benefit from him withdrawing the appeal to the extent that it has already put forth its full burden of proof in prosecuting him and proving that he was guilty. Here, yes, he cooperated with the police department, and yes, that is a benefit, but it's not related in particular to his claim for 212C. There certainly was never any agreement by the government that's ever been asserted that he would still be eligible for 212C or able to apply for 212C if he withdrew that appeal. And as was mentioned, he was eligible for 212C relief even before he withdrew the appeal, took the appeal, you know, any part of that. So it's unclear what right with regard to 212C he gave up by going by choosing to withdraw the appeal. And again, yes, our position is that there can't really be an objectively reasonable detriment or a reliance here on the availability of 212C when the withdrawal of the appeal didn't come until well after, well, at least a month after, almost a month after the enactment of AEDPA. And I should make clear that the date appears to be wrong on the docket, that it was withdrawn on May 2, 1996. In the record at page 100, the docket for the district court says that the appeal was withdrawn May 2, 1996. However, if you look at the Eleventh Circuit's docket, it does say that it was actually withdrawn on May 20, 1996. And the magistrate judge, in making his report and recommendation, actually noted that fact, that it appeared to be an error. And in conclusion, I'd just like to say if the Court determines that all of these arguments regarding the objectively reasonable reliance are appropriately before the Court at this time in litigation because it was presented in the supplemental brief, and if you determine that it's relevant to your analysis, the government would appreciate the opportunity to file a supplemental brief in response. Just very, very briefly, to establish objectively reasonable reliance, Mr. Hock must simply plausibly claim that he would have acted differently if he had known that AEDPA or IRA-IRA was going to render him ineligible for 212C relief. The answer to that question is clear. He says on page 182, I gave up my appeal only because I believed I was eligible for 212C. Had I known that the law of 212C was going to change, I would never have given up my appeal. And of course he wouldn't. Was that the subject matter of a written memorandum or agreement between the defendant and the government? There was no memorandum of agreement, Your Honor. It was a long period of negotiation. So it's just the defendant's perspective, right? No. We have confirming letters from the U.S. Attorney's Office that describe the deal. We have a letter from Catherine Monaghan, the Assistant U.S. Attorney, who helped structure the deal in the record. In fact, we have two of them confirming it. The deal was entered into in June of 1995. Mr. Hock began relying. He testified in October of 1995. And then they implemented this agreement in stages. But the structure of the agreement was set in June of 1995. Thank you. We appreciate it. The argument is from both counsel. And Hank is submitted. Thank you, Your Honor.
judges: Beezer, Bybee, Roth